El Pueblo de Puerto Rico, demandante y apelado, *v.* C. D. Sands, acusado y apelante.

No. 5665.—*Sometido:* Mayo 9, 1935. *Resuelto:* Noviembre 6, 1935.

*Martínez Nadal & Navarro Ortiz,* abogados del apelante; *R. A. Gó-mez, Fiscal,* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pue-blo, apelado.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

Sands fué convicto del delito de abuso de confianza y sostiene que la corte de distrito cometió error al declarar sin lugar una moción de nuevo juicio. El primer fundamento de la moción fué que la corte de distrito erró al permitir que cierto testigo, que no era un contador público autorizado, declarara como perito. Al presentarse la objeción en el curso del juicio, a los letrados del acusado no les fué posible pre-sentar la ley por ellos invocada. Cuando el juez de distrito propuso que se declarara un receso, la defensa retiró la obje-ción. Mientras el fiscal continuaba su examen del testigo con el objeto de demostrar su capacidad como perito contador, los letrados del acusado manifestaron que esto era innecesa-rio, toda vez que la objeción había sido retirada. Surgieron ligeras discusiones respecto a la naturaleza y alcance de la admisión que los letrados de la defensa estaban dispuestos a hacer y luego de un interrogatorio adicional del testigo, se permitió que éste declarara. La defensa entonces excepcionó la resolución de la corte, fundándose en que el testigo no

había presentado ninguna licencia para ejercer la profesión de contador público autorizado en Puerto Rico y había admitido en la silla testifical que no era tal contador público autorizado.

Fuera de cualquier cuestión de renuncia, la investigación preliminar estableció el hecho de que el testigo estaba capacitado para declarar como perito contador. Tampoco podemos convenir con los letrados del apelante en que el testimonio posterior del testigo indicó que éste no estuviera capacitado.

■■ Otro fundamento de la moción fué que el veredicto era contrario a la prueba aducida por El Pueblo. La explicación de este motivo, tal cual figura en la moción, es como sigue:

"Se basa esta alegación en el examen del testigo Juan G. García, Jefe de las Oficinas de Contabilidad de la denunciante Central Aguirre Sugar Company. Dicho testigo era el empleado que en las mencionadas oficinas refrendaba todos los cheques librados por el Cajero C. D. Sands, acusado en este caso. Este testigo declaró que el día 2 de noviembre de 1932, el acusado siendo el Cajero de la Central, libró el citado cheque de $28,050, y aunque hubo error al anotar el cheque en el libro de Caja, donde se puso la cifra de 18,050 en vez de 28,050, sin embargo el dicho testigo, al declarar en el acto de la vista, aceptó que el *Pay Roll* de la Central en aquella semana y en aquel final de mes ascendió aproximadamente a la suma de $28,050 más o menos y que dicho *Pay Roll* fué totalmente pagado y satisfecho con el mencionado cheque de $28,050; de donde resulta la inocencia del acusado en este caso, ya que no se benefició en lo más mínimo ni en nada perjudicó a la Central acusadora el referido error de número cometido por el acusado en el Libro de Caja de la Central."

A esto el apelante dice en su alegato lo siguiente:

"En toda la evidencia presentada en este caso, no se encuentra el menor indicio de prueba directa, ni de prueba circunstancial, tendente a demostrar que el acusado C. D. Sands se hubiere apropiado de dinero perteneciente a la Central Aguirre Sugar Co. para su propio beneficio, ni por encontrársele dinero en su poder o en su casa, o en algún depósito de cuenta corriente de banco o por haber

invertido en algún negocio de hipoteca u operación de préstamo, o por haberlo girado a los Estados Unidos o a algún otro sitio. Es raro que en 22 de septiembre de 1934 se practique un arqueo de caja y no se encuentre falta o error alguno en el balance de números y que dos meses exactos después del 22 de septiembre, o sea, después de las elecciones, se practique un nuevo arqueo de caja, solicitado por el propio acusado Mr. Sands y se encuentre entonces, no el que faltare suma alguna en la caja, ni que se hubiera descubierto evidencia de que el acusado Mr. Sands hubiera sustraído dinero y depositado en algún banco, invertido en alguna operación hipotecaria o de préstamo, girado al exterior o gastado de una manera extravagante en fiestas, orgías, amantes o juegos, sino simplemente que había un ingreso de $28,050.00 reducido a $18,050.00 y unos egresos de siete mil y pico de dólares, aumentados a once mil y pico de dólares, lo cual lejos de llevar a la conclusión de que la caja estaba coja, debió llevar a la conclusión de que en la caja sobraba dinero, a no ser que hubiera ocurrido lo que ocurrió, un error de número en cuanto al ingreso de caja de los $28,050.00, pero una existencia en caja de lo que realmente debía estar, porque según las declaraciones de Edwards y del señor García, Jefe de Oficina, los $28,050.00 del cheque del National City Bank, cobrados para satisfacer el *payroll* de la Central Aguirre Sugar Co. de una semana que montaba a $28,050.00 fué totalmente pagado.

"De suerte que todo el castillo del supuesto desfalco quedó reducido por la propia declaración de los acusadores, a un error de números que en nada perjudicó a la Central Aguirre Sugar Co., privándola de ninguna cantidad, de las que legítimamente debían aparecer en caja, como realmente existentes."

No trataremos de hacer un resumen de toda la prueba de cargo. García, que era un contador público autorizado, no solamente repasó todo el terreno cubierto por Edwards, el perito contador a que se hace referencia en el primer señalamiento, sino que también declaró muchas cosas que no se mencionan en absoluto en el alegato del apelante. Bastará decir que de su testimonio y del testimonio de otros testigos aparece: que como a las siete y media de la mañana del 22 de noviembre de 1932, Sands, cajero de la Central Aguirre Sugar Company, Inc., pidió a García que viniera a la oficina del cajero y le mostró en el piso de la bóveda donde se guar-

daban los libros, un libro de caja del cual se habían arrancado las páginas correspondientes al mes de noviembre; que entonces Sands y García recogieron del suelo muchos papeles rotos que estaban por allí regados y los llevaron, con el libro de caja mutilado, a la oficina del gerente, que aún no había llegado y con quien se comunicaron entonces por teléfono; que más tarde el vicepresidente de la corporación, el gerente de la misma y García recogieron de un basurero que había en la playa otros fragmentos de papeles y que Edwards, que había sido llamado de San Juan, con la ayuda de García, logró pocos días después reconstruir las páginas que habían sido destruídas; que Sands, que había sido informado del hallazgo en el basurero de los fragmentos que faltaban, en la mañana del 25 de noviembre trasmitió a un pariente suyo en St. Petersburg, Florida, el siguiente mensaje: ''Envíame un cablegrama diciéndome ven inmediatamente, urgente;'' que en la tarde del mismo día recibió en respuesta un mensaje que leía así: ''Ven inmediatamente, urgente;'' que mostró esta comunicación a García y al gerente de la Central indicándoles que se le hacía necesario tomar el próximo aeroplano para Miami; que esta sugestión no tuvo la aprobación de las personas a que fué sometida y abandonó la idea de ir a Florida en aeroplano; que Sands era la única persona que tenía la llave de la puerta interior de la caja de seguridad o bóveda; que al presentársele las páginas reconstruídas del libro de caja aceptó la existencia de un déficit y su responsabilidad por ello; que él manifestó que le parecía que la situación era mala para él; que al preguntársele si estaba dispuesto a reparar la pérdida contestó que si le daban un término de quince días para comunicarse con su hermano en California él creía que podía repararla; y que doce o trece meses más tarde una compañía de seguros, luego de practicar una cuidadosa investigación, pagó a la Central Aguirre Sugar Co. la suma de $10,000 de conformidad con los términos de su fianza.

El testimonio de García, en adición al hecho establecido

del déficit, era suficiente. No era necesario que el fiscal demostrara que el dinero había sido hallado en poder de Sands o que éste lo había depositado en algún banco o lo había invertido o remitido a los Estados Unidos o lo había malgastado en una vida licenciosa o que en alguna otra forma había dispuesto del mismo.

Después que la defensa había repreguntado al testigo García, después que el fiscal había terminado el examen redirecto y después que uno de los letrados de la defensa había anunciado que había terminado con el testigo, ocurrió el incidente que a continuación se expresa:

"Lcdo. Martínez Nadal:

"Una sola pregunta.

"P.—¿El pay-roll se pagó, a que se refiere ese cheque de $28,000.00 se pagó?

"R.—Sí, señor.

"Nada más.

"Hon. Fiscal:

"P.—¿Pero cuando se arqueó la caja faltaba cuánto?

"R.—Catorce mil quinientos y pico de pesos.

"P.—Y dentro de esos catorce mil y pico de dólares, ¿estaban los diez mil dólares del cheque?

"R.—Sí, señor."

El testigo no dijo que la nómina en cuestión ascendía a $28,000, sino que la nómina había sido pagada. Sin embargo, si esta declaración puede ser interpretada en el sentido de que la nómina ascendía a $28,000, subsistiría el hecho, que salió a relucir por razón de la siguiente pregunta y respuesta, que la diferencia de $10,000 entre el cheque de $28,000 y el asiento en los libros de $18,000 no se había hecho constar ni se había explicado.

El veredicto no fué contrario a la prueba aducida por El Pueblo.

■ Otro fundamento de la moción se hizo constar así:

"4.—Que esta moción de nuevo juicio se basa principalmente en el descubrimiento de nuevas pruebas que pueden favorecer al acusado, las cuales, a pesar de haber empleado la mayor actividad ra-

zonable, no le fué posible descubrir y aducir en la vista de la causa. Acerca del descubrimiento de dichas nuevas pruebas, exponemos lo siguiente:

"A.—Que con bastante tiempo de antelación a la fecha en que se celebró la vista de este caso, el acusado, queriendo ver y examinar los comprobantes y recibos de los pagos del *pay roll* de la precedente semana y últimos días del mes precedente al dos de noviembre de 1932, a fin de probar con ellos en el juicio que el dinero del cheque montante a $28,050 fué expedido por el acusado en dicha fecha dos de noviembre de 1932, fué totalmente empleado en pagar todos los gastos correspondientes al referido *pay roll* de la última semana y fines del mes de octubre de 1932, acudió o se personó en las oficinas de contabilidad de la central denunciante, y allí trató de examinar dichos comprobantes y recibos, así como el libro de caja de la Ponce and Guayama Railroad Company (que es una pertenencia de la Central Aguirre), y entonces el jefe de dichas oficinas le manifestó al acusado que tanto los comprobantes y recibos del referido *pay roll* de la Central Aguirre, como el libro de caja de la Ponce and Guayama Railroad Company no podía verlos y examinarlos el acusado porque se habían perdido o extraviado, habiendo desaparecido totalmente; que posteriormente el acusado, cuando sus abogados defensores principiaron a hacer diligencias para tratar de ver y examinar dichos comprobantes y recibos y el libro de caja referido (de la Ponce and Guayama Railroad Company) con el fin de presentarlos como prueba en la vista del caso, el acusado les manifestó a sus abogados R. Martínez Nadal, F. Navarro Ortiz y al Lcdo. Vicente Palés Matos, que estaba también cooperando en su defensa, que dicho libro de caja y dichos comprobantes y recibos se habían extraviado y perdido y había desaparecido totalmente, y que el acusado, habiendo hecho activas diligencias en la busca de dichas pruebas, no había logrado descubrirlas o averiguar su paradero, y así dió absoluto crédito a las manifestaciones de don Juan G. García, empleado de la central, quien le manifestó que dichas pruebas no podría verlas el acusado ni examinarlas porque se habían perdido. Alega aquí además, el acusado, que el libro de caja de la Ponce and Guayama Railroad Company, según constaba al acusado por propio conocimiento, contenía en sus asientos todas las constancias necesarias para probar que parte de los mencionados $28,050.00, en cantidad más o menos como de seis a siete mil dólares se había invertido en pagar o satisfacer los gastos del *pay roll* de la Ponce and Guayama Railroad Company, cuyos gastos los satisfacía semanalmente la Central Aguirre por ser una pertenencia de ella; que estos seis o siete mil dólares, y

además los recibos y comprobantes del expresado *pay roll* de la Central Aguirre que montaban a más de $20,000.00 probaban o hubieran probado de la manera más satisfactoria que los $28,050.00 referidos se gastaron totalmente en pagar o satisfacer los expresados *pay rolls* de la Central Aguirre y de la Ponce and Guayama Railroad Company; que después que el acusado hizo las referidas diligencias para conseguir dichos recibos y comprobantes y el referido libro de caja de la Ponce and Guayama Railroad Company y después que estuvo en las oficinas de la Central acusadora y que el jefe de dichas oficinas le aseguró que tanto el libro de caja como los comprobantes y recibos habían desaparecido totalmente, y después que el acusado continuó haciendo activas diligencias que resultaron infructuosas, y se convenció de la pérdida de dichas pruebas, lo manifestó así a sus tres abogados mencionados que por otra parte estaban también haciendo diligencias para tratar de ver y examinar dichas pruebas o averiguar su paradero, a fin de presentarlas en el acto de la vista celebrada el día 23 del pasado mes de abril.

"B. Alega el acusado, además, que en el acto de la vista de este caso, el Ministerio Fiscal presentó como prueba una caja de hierro llena de papeles, algunos rotos, conteniendo dicha caja alrededor de mil documentos más o menos; que al presentar el Fiscal como prueba en el acto de la vista dicha caja llena de papeles, manifestó que la presentaba como prueba para demostrar que en ella había muchos recibos y documentos rotos, pero sin explicar de qué época o de qué clase eran los tales recibos y documentos rotos, por lo que los defensores del acusado se opusieron a la admisión de dicha prueba, alegando que era imposible leer tantos documentos sin especificarse en qué consistía, pero la corte admitió como prueba la mencionada caja de caudales de hierro conteniendo alrededor de mil recibos y documentos más o menos, algunos de ellos rotos; que en aquel momento, al presentarse como prueba por el fiscal dicha caja conteniendo una cantidad tan grande de papeles, no sospechó el acusado ni lo sospecharon sus tres abogados defensores presentes en aquel acto, que allí pudieran estar los recibos y comprobantes del *pay roll* de gastos que fueron satisfechos con el referido cheque de $28,050.00; y que así transcurrió todo el tiempo de la celebración del juicio sin que el acusado ni sus abogados pudieran darse cuenta de que les hubiera sido posible de algún modo conseguir las pruebas que tanto habían buscado, consistentes en los referidos recibos y comprobantes.

"C.—Que después de dictado el veredicto del jurado, en el juicio de esta causa que se celebró el 23 de abril último y a los pocos minutos de leerse el veredicto, el acusado, acompañado de uno de sus

abogados, el Lcdo. F. Navarro Ortiz, se acercaron a la mencionada caja de hierro de caudales por mera curiosidad, y al verla y examinarla, tuvieron la sorpresa de cerciorarse y descubrir que en dicha caja, entre el montón de papeles que en ella había, se hallaba la mayor parte de los recibos y comprobantes del *pay roll* de gastos de la Central Aguirre, correspondientes a la precedente semana y a los últimos días del mes precedente al dos de noviembre de 1932, en cuya fecha el acusado libró el citado cheque de $28,050.00; que entonces, los abogados F. Navarro Ortiz y Vicente Palés Matos, en compañía del acusado, después de haber cambiado impresiones sobre el hallazgo de aquellas pruebas que antes habían buscado con tanta diligencia, resolvieron ponerlo inmediatamente en conocimiento, como así lo hicieron, del otro abogado defensor, Lcdo. R. Martínez Nadal, que había partido para Mayagüez, y algunos días después, en San Juan, en una reunión que celebraron el acusado y sus tres letrados defensores, en la calle Allen Núm. 18, para estudiar la manera de anular el juicio celebrado, con el fin de poder presentar a la corte las pruebas que tanto habían buscado y que al fin habían descubierto, allí entonces, en dicha reunión, a la que asistió el Sr. Constantino Fernández, Perito Mercantil y Contable Público, legalmente titulado para ejercer en Puerto Rico su profesión de Contable, que viene ejerciendo desde hace más de veinte años, el dicho señor Constantino Fernández manifestó al acusado y a sus defensores que el libro de caja de la Ponce and Guayama Railroad Company está actualmente en las oficinas de contabilidad de la denunciante Central Aguirre y que él estaba absolutamente seguro de tal afirmación. Aquí alegamos: que en dicho libro de caja, según se expresa arriba, consta detalladamente la prueba de que una parte de los referidos $28,050, o sea, una suma más o menos de seis a siete mil dólares fué empleada en el pago del *pay roll* de gastos de aquella semana de la Ponce and Guayama Railroad Company, que es una pertenencia de la Central Aguirre; que el acusado y sus abogados defensores, hasta dicha fecha, en que oyeron la afirmación del Contable don Constantino Fernández, estaban bajo la creencia absoluta de que dicho libro de caja no existía, porque se había perdido o extraviado, o se lo habían robado, según arriba se expresa; y que habiendo aparecido dicho libro, o teniendo ya la seguridad que está actualmente en las oficinas de contabilidad de la Central Aguirre, y teniendo también la seguridad de que los recibos y comprobantes del referido *pay roll* de la Central Aguirre, correspondiente a los días precedentes al 2 de noviembre de 1932 se hallan en la mencionada caja de hierro que el Fiscal presentó como prueba en el acto de la vista, según se ha expresado, en tal virtud,

·el acusado y sus tres abogados defensores tienen ahora la completa seguridad de que, si se celebrara un nuevo juicio en este caso, po-·drían presentar como prueba dicho libro de caja y dichos recibos y comprobantes, y que tales documentos probarían satisfactoriamente ·en el nuevo juicio que el acusado no se benefició con el citado cheque de $28,050.00, ni hubo ningún perjuicio para la Central Aguirre, ya que todo ese dinero se empleó y se gastó en el pago del *pay roll* ·de gastos de la Central Aguirre y en el pago del *pay roll* de gastos ·de la Ponce and Guayama Railroad Company, pertenencia de la Central Aguirre, lo cual había de quedar plenamente probado y justificado al presentar como prueba en el nuevo juicio el referido libro de caja y los referidos comprobantes y recibos.

''D.—Alega además el acusado que la prueba de que se trata, tanto los recibos y comprobantes de la Central Aguirre, que se hallan ·en la caja de hierro referida como el libro de caja de la Ponce and Guayama Railroad Company, que se halla ahora en las oficinas de ·contabilidad de la Central Aguirre, es una prueba material porque se refiere al *issue* levantado en el juicio, y que dicho *issue* es también material y no colateral porque dicha prueba tiende a demostrar que ·en este caso sólo hubo un error de número al poner en el libro de ·caja la cifra de $18,050, en vez de $28,050.00, pero que dichos $28,050.00 se emplearon totalmente en el pago del *pay roll* de gastos ·de la Central Aguirre y en el pago del *pay roll* de gastos de la Ponce .and Guayama Railroad Company; que dicha prueba es una prueba ·competente y absolutamente admisible, sin duda de ninguna clase, y que además es plenamente material porque hay en ella toda la potencialidad necesaria para producir en el nuevo juicio la absolu-·ción del acusado; que dicha prueba se refiere al *issue* de culpable o no culpable, porque ella justifica que el acusado no tuvo ningún beneficio en la referida suma de $28,050.00; que no es una evidencia adicional, o sea, del mismo carácter de la practicada en el juicio, ·sino que es una nueva prueba que cambiará totalmente la faz del caso a favor del acusado, porque probará su completa inocencia, ya que ·en el empleo de dichos $28,050.00 no hubo beneficio alguno para él ni perjuicio para la Central, ni para nadie, según así se acreditará ·con dicha prueba; que se trata además de evidencia completamente .admisible, ya que la Central no podrá negarse a llevar a la vista del nuevo juicio el referido libro de caja de la Ponce and Guayama Rail-road Company, ni los referidos recibos y comprobantes del *pay roll* ·de la Central Aguirre, porque ambas pruebas están en su poder, y la Central no puede negarse a presentarlas; que los hechos que se tratan de probar con dichas pruebas no podían ser probados en el

juicio que se celebró por medio de otra clase de pruebas; y que la nueva prueba que tratamos de presentar en el nuevo juicio, no se refiere a nuevas defensas, ni a hechos ocurridos después del juicio, ni se trata de evidencia conocida y abandonada, sino que se trata de una prueba que el acusado y sus defensores la buscaron con la mayor diligencia antes del juicio y no la pudieron encontrar y que la descubrieron con posterioridad al veredicto en la forma que queda expresada.''

García, en una contradeclaración jurada, dijo:

''Juro solemnemente que la última vez que hablé personalmente con el citado C. D. Sands fué el martes día 29 de noviembre 1932, cuando él me llamó por teléfono desde el hotel para informarme que allí había un policía con una orden de arresto y que no comprendía a qué se debía aquello, porque él había hablado con Mr. Bancroft para que le concediera 15 días para él comunicarse con su familia en el Norte. Ese mismo día a que me refiero, C. D. Sands fué encarcelado y luego después solemnemente juro que no volví a verlo hasta el día del juicio.

''Juro además que en ninguna ocasión ni yo, ni nadie conectado con la Central Aguirre Sugar Company, The Ponce & Guayama Railroad Company o Luce. & Co., S. en C., informó a C. D. Sands que los libros y comprobantes de caja se habían extraviado. Precisamente en la noche del domingo, día 27 de noviembre de 1932, cuando C. D. Sands fué llamado a la oficina para que compareciera ante los señores Bancroft, Obén, Edwards y yo, no solamente se le dijo a C. D. Sands que todos los libros, comprobantes de caja, etc., habían sido encontrados y reconstruídos los papeles rotos, pero también se le mostraron para que él los examinase y se cerciorara si la diferencia que habíamos encontrado en caja existía o no. Repetidas veces aquella noche se le invitó para que él revisara como quisiera toda la documentación que él tenía al frente y que subsiguientemente se presentó en evidencia en el caso que se ventiló ante esta corte, y aseguro solemnemente que después de hojear el citado C. D. Sands algunos de los papeles que allí había, pero siempre demostrando muy poco interés en todo aquello, dijo: 'Que si los libros reflejaban una diferencia de $14,000.00 más o menos, que él creía que estaba bien, es decir, que existía la diferencia y entonces fué que el citado C. D. Sands ofreció a Mr. Bancroft comunicarse con sus familiares a fin de tratar de reunir el dinero.' ''

Del récord taquigráfico de lo ocurrido al presentarse en

juicio la prueba que ahora se describe como "nuevamente descubierta" hacemos el siguiente extracto:

"Hon. Fiscal:

"Ahora yo voy a presentar, Sr. Juez, estos libros, debidamente identificados.

"Lcdo. Martínez Nadal:

"No hay objeción alguna.

"Hon. Juez:

"Entonces los libros. . .

"Hon. Fiscal:

"Con los comprobantes, Sr. Juez.

"Lcdo. Palés Matos:

"¿Todos?

"Hon. Fiscal:

"Uno por uno con las partidas que hay en el libro.

"Lcdo. Martínez Nadal:

"Siempre que estén en las fechas del 7 de septiembre al 22.

"Hon. Fiscal:

"Y voy a presentar los comprobantes de ingresos del dinero que recibió, firmados por él todos, uno por uno.

"Hon. Juez:

"Entonces se marca el libro con el número tres, los comprobantes con el número cuatro y los comprobantes de ingresos con el número cinco.

"P.—¿Estos son comprobantes de egresos?

"R.—Estos son de egresos, los blancos de desembolsos y los amarillos de ingresos.

"R.—Llamamos al Sr. Sands a la oficina y al entrar a la oficina yo le pregunté: 'Mr. Sands, ¿cuándo se hizo su último contado de caja?' me dijo él: 'Hace dos o tres días', le digo: 'Ud. tomó algunos datos que comprueban lo que Ud. hizo?' dice: 'Sí, señor, los voy a buscar,' fué a la oficina suya a su caja y trajo este libro que está aquí y me dijo: 'Este es el arqueo que yo hice en noviembre 17.'

"P.—¿Ese es un libro oficial de la Aguirre?

"R.—No, señor, eso lo puede hacer en cualquier clase de libro para satisfacción de que su caja está bien.

"P.—¿Estos son los números del Sr. Sands?

"R.—Sí, señor; todos.

"P.—¿Y qué arroja ese libro hecho por el Sr. Sands?

"R.—Viendo este libro entonces tratamos de cotejar estas partidas con las partidas que aparecen del libro de caja y encontramos que la primera partida, aquí, que aparece con $155,644.53 al compararla con el libro de caja, había una diferencia de catorce mil pesos más o menos.

"P.—Así que ese libro privado que él llevaba con los libros oficiales de la corporación que llevaba él también aparecía la suma?

"R.—Sí, señor.

"P.—¿Que es un libro privado de él?

"R.—Sí, señor.

"Para presentarlo como prueba, Sr. Juez, dice que son los números del Sr. Sands.

"Lcdo. Martínez Nadal: No hay objeción."

Al resolver la cuestión relativa al descubrimiento de nueva prueba, el juez de distrito, después de exponer ciertos principios elementales de derecho, dijo en parte:

"Si aplicamos la jurisprudencia transcrita al caso de autos, podemos decir que el acusado, C. D. Sands, era y fué por mucho tiempo cajero de la Central Aguirre Sugar Co., Inc., y que nadie mejor que él estaba en condiciones de conocer la contabilidad que en dicha corporación se llevaba y saber de una manera clara y evidente la inversión que se daba al dinero que él recibía y pasaba por sus manos al darle salida para ser empleado.

"Además si el Sr. Sands sabía que su defensa estaba en ciertos comprobantes y libros de la Central Aguirre y que tales documentos no se le facilitaron a pesar de haber requerido para ello a los directores de dicha corporación, él debió de haber acudido ante esta corte solicitando de la misma que se presentaran y se trajeran dichos libros para ser revisados como evidencia en su caso, cosa que no hizo y lo cual demuestra, a nuestro juicio, que él no observó en este caso una razonable y debida diligencia como lo exige la ley. Pudiendo verse en relación con el particular la doctrina siguiente:

"'A new trial will not be granted on the ground of newly discovered evidence, where the evidence claimed to have been newly discovered, was known to the party before or at the time of the trial.' People v. Lyle, 4 Pac. 977; Somona v. Stafen, 125 Cal. 32, 57 Pac. 681."

No hallamos error que dé lugar a la revocación al declarar sin lugar la moción de nuevo juicio, y *la sentencia apelada debe ser confirmada.*