EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* FELIPE LÓPEZ REYES, acusado y apelante.

Número 15319.

*Sometido:* 2 de febrero de 1953. *Resuelto:* 21 de abril de 1954.

*Santos P. Amadeo* y *José Luis Méndez,* abogados del apelante; *Hon. Secretario de Justicia José Trías Monge (Juan B. Fernández Badillo, Secretario Interino de Justicia,* en el alegato) y *J. Rivera Barreras, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del tribunal.

El Fiscal de la Sección de Aguadilla del anterior Tribunal de Distrito de Puerto Rico don Julio Fernández Cabrera, presentó una acusación contra el acusado don Felipe López Reyes, por un delito de violación, por haber tenido dicho acusado comercio carnal con doña María Tacoronte Morales, por medio de la fuerza y de la violencia, sin el consentimiento de dicha María Tacoronte Morales, quien no era allí y entonces su propia mujer, y quien opuso resistencia, siendo vencida dicha resistencia por la fuerza y la violencia empleadas por el acusado.

El caso se vió ante un tribunal de derecho, después de renunciar el acusado a su derecho de ser juzgado por un jurado, declarando como testigos de El Pueblo de Puerto Rico, el doctor Felipe J. Achecar, la perjudicada señora María Tacoronte Morales, su hermano don Miguel Tacoronte Morales y su cuñada doña Juana Miranda de Tacoronte. Después de terminarse la prueba de la acusación, el abogado del acusado presentó una moción de absolución perentoria por el fundamento, que la prueba aducida para corroborar la declaración de la perjudicada no era suficiente para sostener la acusación, la

cual fué declarada sin lugar por el juez que presidía la sala. El acusado se abstuvo de presentar prueba, y sometió su caso por la prueba de la acusación, procediendo el Juez Sentenciador a declararlo culpable de un delito de violación. El día señalado para el pronunciamiento de la sentencia, el acusado, fué condenado a sufrir una pena de no menos de dos años ni más de ocho años de presidio, con trabajos forzados.

La prueba de la acusación demostró que por el mes de febrero de 1951, la perjudicada doña María Tacoronte Morales vivía en el Barrio Mirasol de Lares, en una caseta ubicada en una finca de su hermano don Miguel Tacoronte Morales; que la perjudicada es una mujer paralítica, casi sin movimiento en las piernas, y tiene que andar de rodillas. Aunque su edad natural es de 31 años, se le concede una edad mental de 12 años más o menos, por ser un tipo intermedio entre la idiotez y la moronidad (*feeblemindedness*) ; que en uno de los días del mes de febrero de 1951, entre siete y ocho de la noche, el acusado se presentó en la caseta, armado con un machete y le dijo a la perjudicada, que si ella no lo quería la mataría; entonces la cogió en brazos, la llevó hasta la cama, le desbarató la ropa que llevaba puesta y tuvo contacto carnal con la perjudicada. Hay evidencia de dos contactos carnales posteriores revestidos del mismo grado de violencia.

Aunque la evidencia demuestra que la perjudicada era visitada en la caseta en que vivía, por sus sobrinas, que venían todos los días a traerle la comida, por su cuñada, quien venía a verla dos o tres veces a la semana, y que su hermano acostumbraba a ir cerca de la caseta donde vivía para atender unas colmenas, la perjudicada no le dijo a los familiares que la visitaban lo que le había sucedido con el acusado. La perjudicada explica que no se atrevió a decírselo a su hermano "porque iba y me castigaba". Cuando la cuñada pudo darse cuenta del estado de embarazo de la perjudicada, ocho meses y días después del mes de febrero, obligó a la inválida a decirle lo que le había sucedido; entonces, la perjudicada le confesó

que estaba encinta del acusado, que se lo decía en secreto, "porque ella estaba amenazada de él si lo decía".

Los dos errores señalados en la apelación ante nos, son los siguientes:   .

"1. La corte sentenciadora erró al permitir que el doctor Felipe J. Achecar declarara sobre el estado mental de la perjudicada, sin haberse demostrado y sin haber sido aceptada su capacidad como perito psiquiatra o psicólogo por el abogado de la defensa, tanto más cuando aquél declaró que no había practicado un examen mental de la perjudicada y sí solamente un **examen** vaginal.

"2. La corte sentenciadora erró al declarar sin lugar la moción de absolución presentada por el acusado-apelante, basada en que no hubo prueba de corroboración de la declaración de la perjudicada, conforme lo requiere el artículo 250 del Código de Enjuiciamiento Criminal de Puerto Rico, según fuera enmendado por la Ley de 11 de marzo de 1909 e interpretado dicho artículo por la jurisprudencia de este alto Tribunal."

En cuanto al primer error, la transcripción de la evidencia demuestra que se aceptó la capacidad del declarante como médico cirujano en ejercicio de su profesión en el pueblo de Lares.   También demuestra que como médico examinó a la perjudicada, "una persona paralítica, de cierto retardo mental"; que el motivo del examen fué un estado de embarazo; que se le hizo el examen vaginal de rigor y se le tomaron las medidas obstétricas; que habiendo observado cierto estado de parálisis y que el feto no estaba encajado, determinó mandarla al Hospital de Distrito de Arecibo; que observó en la paciente "cierto estado de idiotez", que se trataba de una morona, que podía distinguir entre el bien y el mal pero que la edad mental de ella era de doce años más o menos; que pudo observarla porque ella "también estuvo hospitalizada en el Hospital de Lares después que dió a luz; después que ella dió a luz fué referida otra vez al Hospital de Lares porque había el problema de dónde mandarla"; que ella no es loca, "ella es una retardada mental" que "podría contestar lo

que contestaría una persona de doce años". Como se ve, no es posible afirmar que el doctor Achecar sólo practicara un examen vaginal de la perjudicada. Cierto evidente estado de parálisis tuvo que ser investigado por el médico. Cierto manifiesto estado de idiotez también fué observado antes y después del parto.

El primer error queda reducido a determinar si un médico cirujano, en ejercicio de su profesión, a quien su trabajo clínico obliga a examinar a una persona, y con oportunidad de observar una condición congénita de parálisis y cierto estado de idiotez, puede declarar como perito sobre el estado mental de su paciente. La teoría del apelante parece ser que sólo un perito psiquiatra o psicólogo puede declarar sobre el estado mental de una persona. En apoyo de su teoría cita los casos de *Pueblo* v. *Sands*, 49 D.P.R. 16; *Masocco* v. *Schaaf*, 234 App. Div. 181, 254 N.Y.S. 439; *Selleck* v. *Board of Education*, 276 App. Div. 263, 94 N.Y.S.2d 318; *Nelson* v. *Sun Mutual Insurance Co.*, 71 N. Y. 453. Ninguno de estos casos sostiene el error alegado por el demandante, ni son casos de aplicación directa a peritaje médico sobre el estado mental de una persona. El caso de *Pueblo* v. *Sands*, supra, se refiere a un perito contable y su testimonio fué admitido por el tribunal sentenciador por haberse probado durante el examen preliminar la capacidad del perito. El caso de *Masocco* v. *Schaaf*, supra, se refiere a un oficial del Consulado Italiano de la ciudad de Buffalo, a quien se le permite declarar sobre la validez de un matrimonio, por el simple conocimiento que le daba su función consular, a pesar de no ser abogado. El caso de *Selleck* v. *Board of Education*, supra, trata de un médico del Canadá, que no tenía licencia para ejercer su profesión dentro del estado de Nueva York, a quien se le permite declarar sobre la condición de un paciente escolar que sufriera un accidente. El caso de *Nelson* v. *Sun Mutual Insurance Co.*, supra, trata de un agente de seguro a quien se le impugna

su capacidad para declarar, sobre el significado de la frase "riesgo en puerto" contenida en una póliza de seguro marítimo.

Esto nos obliga a realizar por nuestra parte, el estudio del error apuntado por el apelante, para proteger cualesquier derechos del apelante afectados por la resolución de la sala sentenciadora.

La teoría del peritaje legal descansa en dos proposiciones del conocimiento. La primera, el conocimiento adquirido a través del estudio de las materias científicas, incluídas dentro de una profesión, o dentro de una especialización en alguna rama del saber; y la segunda, el conocimiento adquirido a través de la experiencia cotidiana en una tarea, o por contacto directo con alguna actividad del ser humano. El aspecto puramente profesional del peritaje no forma una determinación excluyente del otro peritaje práctico. En cuanto al testimonio médico se refiere, basta que se pruebe a satisfacción del tribunal, que el testigo es un médico graduado de una escuela de medicina, para que se le considere capacitado para declarar sobre cualesquiera de las materias científicas comprendidas dentro de su profesión, sin necesidad de probar su especialización en una de las materias comprendidas dentro de dicha profesión, aunque se trate de preguntas hipotéticas sobre hechos supuestos, no observados por el testigo médico. Cuando además del conocimiento profesional correspondiente, el testigo ha tenido oportunidad de observar el caso como clínico, por ser el médico de la familia, o el médico a quien se le ha referido el caso para su atención, el valor de credibilidad de su testimonio aumenta en proporción a sus oportunidades de estudio y observación del caso específico.

El desarrollo de la medicina ha producido la especialización en determinadas enfermedades. Pero la jurisprudencia se ha visto obligada a consignar el hecho que el especialista necesita para el ejercicio normal de su profesión, de aquellos centros médicos donde sea factible la reunión de distintos pro-

fesionales para la atención de un solo caso, hecho que se da con mayor frecuencia en las grandes ciudades, donde el acceso a un número mayor de pacientes permite el desarrollo de esta modalidad. Por esta razón se ha considerado, que consagrar el principio que sólo el especialista puede ser perito dentro de la materia médica comprendida dentro de su especialidad, no ayudaría a los fines de la justicia, y por el contrario, constituiría un discrimen en contra de los litigantes de escasos recursos.

La cuestión ha sido resuelta fundamentalmente más en torno al grado de credibilidad que pueda merecer un testimonio médico especializado sobre un testimonio médico no especializado, que en torno a la falta de capacidad del perito médico ordinario. Esta regla mayoritaria se aplica lo mismo a enfermedades mentales que a cualquiera otra enfermedad: 54 A.L.R. 862 *et seq.* (1928); *Monahan* v. *Roderick*, 166 N.W. 725, (Evans), (1918), cita precisa a la página 729; *Miller* v. *Miller*, 23 N.W.2d 760, (Oliver), (1946), cita precisa a la página 762; *Storbeck* v. *Fridley*, 38 N.W.2d 163, (Hale), (1949), cita precisa a la página 165; *In re Brazman's Will*, 173 S.E. 623, (Blease), (1934), cita precisa a la página 625 y 626; *Holt* v. *State*, 181 P.2d 573, (Jones), (1947), cita precisa a las páginas 580 y 581; *Citarella* v. *Equitable Life Assur. Soc.*, 59 N.Y.S.2d 215, (*Per Curiam*), (1945); *Grant* v. *Commonwealth*, 196 S.W.2d 601, (Rees), (1946), cita precisa a la página 602; *State* v. *Hawkins*, 199 S.E. 284, (Winborne), (1938), cita precisa a la página, 289.

Aplicando la regla mayoritaria de la jurisprudencia a las realidades puertorriqueñas, adoptamos como regla local la siguiente: un médico en la práctica legal de su profesión en Puerto Rico, tiene competencia para declarar como perito en cualquiera rama del conocimiento científico comprendido dentro de la medicina, y por lo tanto, puede contestar preguntas hipotéticas sobre hechos supuestos o preguntas basadas en su

conocimiento personal del caso, por haber estado dicho caso bajo su cuidado profesional y observación o por haber sido médico regular del paciente. La especialización del conocimiento médico sólo implica un mayor grado de probabilidad en la corrección científica en sus conclusiones, y es un índice que atañe exclusivamente al mayor grado de credibilidad del testimonio.

En este caso hemos extractado aquella parte de la evidencia que demuestra, que la perjudicada estuvo sometida a un examen físico del médico declarante y estuvo bajo su observación profesional antes y después del parto. La literatura médica más accesible al entendimiento medio, demuestra que cierto estado de idiotez, de tipo morónico (*feeblemindedness*), puede ser observado por signos externos de degeneración física congénita, y que el estado mental de una persona en un caso ordinario, deja huellas aparentes que pueden ser comprobadas mediante observación del paciente, máxime cuando la observación la hace un médico con práctica general de su profesión. La conclusión sobre la edad mental de la perjudicada resulta correcta de acuerdo con la escala de *Binet-Simón:* Vide: *A Text Book of Psychiatry*, Henderson & Gillespie, Séptima edición del Oxford University Press (1950), cita precisa a la página 573; *Mental Defect*, Lionel S. Penrose, Edición de Farrar & Rinehart (1934), cita precisa a la página 109 et. seq. capítulo X; *Traumatic amentia in general; Mental Deficiency (Amentia)*, A. F. Tredgold, Quinta Edición de William Wood and Company (1929), cita precisa a la página 159; *Medical Dictionary for Lawyers*, Bernard S. Maloy, Edición de Callaghan and Company, (1942); *Medical Trial Technique*, Irwing Goldstein y L. Willard Shabat, Edición de Callaghan and Company (1942), cita precisa a la página 90.

2. La evidencia demuestra que durante ocho meses y días la perjudicada en este caso no le comunicó a sus familiares el hecho delictivo y que sólo cuando su estado de emba-

razo fué demasiado evidente, contestando preguntas inquisitivas de su cuñada le confesó que estaba encinta del acusado, que se lo decía en secreto "porque ella estaba amenazada de él si lo decía." Esta conducta que parecería irracional en una persona adulta, en pleno uso de sus facultades mentales y en unas condiciones de salud física que le permitiera cierta defensa de su persona ante la agresión que teme, resulta completamente racional en una morona, que vive en el estado de indefensión física en que vivía la perjudicada antes y después de consumado el acto delictivo. El mismo temor que manifiesta de ser castigada por su hermano si el hermano se enteraba de su ultraje, el mismo terror que se desprende de la secretividad de su confesión, son circunstancias que nos hacen aplicar a este caso la excepción a la regla de admisibilidad que las manifestaciones de la perjudicada para ser admisibles como parte del *res gestae* deben ser contemporáneas al hecho delictivo. Nuestra propia jurisprudencia tiene establecido el principio que el factor tiempo no es fijo e inmutable, y que puede variar de acuerdo con las circunstancias de cada caso. Así hemos aceptado como admisibles manifestaciones de la perjudicada hechas a los tres meses, a los nueve meses y aún hasta al año después de la ocurrencia del hecho delictivo: *Pueblo* v. *Álvarez*, 47 D.P.R. 161, (Wolf), (1934), cita precisa a la página 163; *Pueblo* v. *Muñoz*, 68 D.P.R. 171, (Marrero), (1948), cita precisa a la página 175; *Pueblo* v. *Blanco*, 40 D.P.R. 130, (Hutchison), (1929), cita precisa a la página 131. Por lo tanto, siendo admisible como evidencia de corroboración los testimonios prestados por el doctor Achecar y la cuñada de la perjudicada, señora Juana Miranda de Tacoronte no se cometió el segundo error alegado.

*Debe confirmarse la sentencia apelada.*