EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* AN-
TONIO DE JESÚS CRUZ, c/p TOÑO, acusado y apelante.

*Número:* CR-66-80      *Resuelto:* 10 de marzo de 1967

*Domingo R. Emanuelli Rivera* y *Obdulio Bauzá,* abogados del apelante; *J. F. Rodríguez Rivera, Procurador General Interino,* y *Héctor R. Orlandi Gómez, Procurador General Auxiliar,* abogados de El Pueblo.

El Juez Asociado Señor Pérez Pimentel emitió la opinión del Tribunal.

El apelante fue acusado de un delito de violación consistente en que para uno de los días del mes de marzo de 1963 tuvo relaciones sexuales con la joven Elba Luz Lerdo Nieves quien no era su esposa, sin el consentimiento de ésta, en contra de su voluntad y por medio de la fuerza y la violencia y bajo amenaza de grave daño corporal.

La prueba de cargo presentada ante un jurado consistió en los testimonios de la joven agraviada Elba Luz Lerdo, de doña Catalina Estrada, abuela y madre de crianza de dicha joven, del policía Roberto Sanabria y del Dr. Gustavo Rivera Ayala.

De acuerdo con dicha prueba para el mes de marzo de 1963, la joven Elba Luz, de 14 años y seis meses de edad, vivía en Lares en casa de un tío suyo. En uno de los días de ese mes de marzo vino a Río Piedras y se quedó a dormir en

casa de su tía y hermana de crianza Julia Ramos, quien vivía con su esposo, el aquí apelante, en la Extensión San Agustín de Río Piedras. La joven durmió en una habitación contigua a la que ocupaban su tía y el acusado. Declara dicha joven que se quedó dormida cuando sintió que alguien la halaba por las piernas y vio al acusado desnudo quien le dijo que no dijera nada que la iba a matar y ella temiendo porque sabía que el acusado tenía un revólver en la casa no gritó; que el acusado le tapó la boca con una sábana, la desvistió, la atropelló y forzándola tuvo relaciones sexuales con ella; que el acusado estuvo como una hora con ella, la sábana se manchó con sangre; que luego el acusado se fue para su habitación y ella se quedó llorando y no se atrevía decírselo a nadie porque su tía estaba encinta. Declaró además que al día siguiente se levantó, se desayunó, hizo lo que tenía que hacer y fue y lavó la sábana para que su tía no se enterara y no sufriera. Después de almuerzo se fue con María, esposa de Segundo, para la casa de su abuela doña Catalina Estrada, quien vive en el barrio Carraízo de Trujillo Alto; que no le dijo nada a su abuela porque el acusado la había amenazado de muerte. Como a la semana, en el mes de abril, volvió a quedarse en la casa de su tía Julia porque ésta la mandó a buscar debido a que estaba próxima a dar a luz. Por la noche del día que llegó ella se acostó a dormir en la misma habitación contigua a la del acusado y su esposa. El acusado volvió a entrar a su habitación en pantaloncillos, se acostó con ella y estuvo más tiempo que la primera vez e hizo eso dos veces sin descansar. Tampoco dijo nada a nadie de lo que le había pasado. Como a los dos días ella se acostó a dormir como a las diez de la noche y no esperaba al acusado porque ya habían pasado dos días y no había ido donde ella. Esa noche ella estaba despierta cuando el acusado entró en pantaloncillos; ella se levantó y salió con idea de ir a la habitación de Julia pero no llegó y volvió creyendo que el acusado estaba en el cuatro de baño donde había ido; que éste regresó y se

acostó con ella y estuvo más tiempo que la primera y la segunda vez; que el acusado hizo eso varias veces esa noche; que entre una y otra vez el acusado descansaba; que los dos estaban desnudos; que la última vez que lo hizo ella salió para afuera de la habitación, se encontró con Julia y le dijo a ésta que tenía calor, que se iba a bañar y así lo hizo; que eso ocurrió tardecito ya, entre doce y media y una de la mañana. Declaró finalmente que al otro día le mandó razón a su abuela para que la fuera a buscar porque ya no soportaba los abusos del acusado, y aquélla así lo hizo. Al día siguiente le relató a su abuela lo que había pasado porque estaba asustada. No quedó encinta. Prestó declaración ante el fiscal en noviembre de 1963.

La señora Catalina Estrada, abuela de la joven agraviada, declaró que su nieta, estando en la casa de Julia, le contó en el mes de abril lo que le había sucedido con el apelante. (1) Con fuerte oposición de la defensa declaró: "Elba Luz me dijo a mí que en el mes de marzo que ella estuvo en casa de mi hija Julia, que es hermana de ella y tía, pues me contó que ella fue de visita, y le cogió tarde y se quedó a dormir allá; que el señor de Jesús se le fue a la cama esa noche, que entonces ella hizo fuerza con él, que él le ofreció muchísimas cosas y todo y que le iba a enseñar a guiar, que le iba a dar dinero y la amenzó y todas esas cosas y entonces a la fuerza pues ella, siempre la venció, pero como él es un hombre tan . . . , que tiene mucha fuerza, pues la venció, se le fue a la cama y entonces ella como él la amenazó no se atrevió a decirme nada a mí ni a ninguno de la familia ella no dijo nada. . . . Sí, ella me dijo él la había desgraciado, ella me lo dijo en abril, que la primera vez que fue en marzo, pero que con las amenazas no se atrevió a decir nada."

---

(1) En el contrainterrogatorio, declaró, sin embargo, que fue en la casa de la testigo en Carraízo y no en casa de Julia, donde su nieta le hizo el relato de lo que le ocurrió con el acusado.

Declaró además esta señora que mandó a buscar al acusado y que éste llegó a su casa, entró, se dirigió donde estaba Elba Luz fregando y le tiró una bofetada y que le negó que él hubiera sido; que como a la semana llevó a la muchacha donde un médico para que la examinara y que no fue hasta el mes de noviembre que denunció los hechos al fiscal porque estaba esperando que su hija Julia diera a luz. El policía Roberto Sanabria declaró que practicó una investigación en este caso y ocupó un revólver en la casa del acusado que le fuera entregado por la esposa de éste y que dicho revólver aparece inscrito a nombre del apelante.

El doctor Gustavo Rivera Ayala declaró que el día 28 de octubre de 1963 examinó a la menor Elba Luz Lerdo y encontró que dicha joven había perdido la virginidad hacía ya algún tiempo, que la desfloración no era reciente.

Como única prueba de defensa declaró la señora Julia Ramos, esposa del acusado. Dijo en síntesis, que fue en el mes de enero que su sobrina Elba Luz vino de Lares con un hermano de la testigo y la esposa de éste y que los tres durmieron en su casa en la habitación contigua a la de ella; que las puertas de las habitaciones de su casa tienen un enrejillado a la parte superior y que el día que Elba Luz durmió en su casa no sintió ruido alguno que le llamara la atención; que Elba Luz nunca se quejó de que alguien la hubiera molestado; que en el mes de marzo Elba Luz se quedó en su casa como tres semanas o trece o quince días y que fue en enero que ella durmió una noche en su casa; que la madre de la testigo nunca fue a su casa a buscar a Elba Luz; que tuvo una conversación con su madre sobre una mancha que tenía el *mattress* pero que la mancha no era de sangre; que el acusado ha sido un esposo ejemplar con ella, que no ha sido convicto de delito y que en una ocasión le pegó con motivo de una nómina que le hizo mal.

El apelante señala la comisión de nueve errores. En los primeros dos sostiene (1) que el testimonio de Catalina

Estrada González sobre la queja que le diera su nieta Elba Luz, es prueba de referencia que no es parte del *res gestae* y por tanto inadmisible en evidencia, y (2) que la prueba es insuficiente para sostener el veredicto de culpabilidad.

En los procesos por el delito de violación no puede declararse convicto al acusado por la sola declaración de la mujer agraviada, a menos que tal declaración se corrobore con alguna otra prueba que por sí misma, y sin tomar en consideración la declaración de la mujer agraviada, tienda a establecer la relación del acusado con la comisión del delito. Regla 154 de Procedimiento Criminal. La única prueba presentada en el presente caso para corroborar el testimonio de la mujer agraviada fue la declaración de su abuela sobre la queja que aquélla le hiciera. Prueba sobre la queja se admite en evidencia cuando la misma forma parte del *res gestae*. Ya en el caso de *El Pueblo* v. *Calventy*, 34 D.P.R. 390 (1925), definimos el verdadero propósito y el fundamento de la doctrina del *res gestae*. Al efecto copiamos en dicho caso de la obra del Profesor Wigmore, lo siguiente:

" 'Este principio general se funda en la experiencia de que bajo ciertas circunstancias externas de conmoción física puede producirse una tensión de excitación nerviosa que paraliza las facultades reflejas y pierden su control, de modo que la manifestación que entonces tiene lugar responda de una manera espontánea y sincera a las sensaciones y percepciones reales ya producidas por la sacudida externa. Puesto que esta manifestación se hace bajo el dominio inmediato y sin control de los sentidos, y durante el breve período en que las consideraciones de interés propio no podían haberse traído enteramente a colación por la reflexión razonada, la manifestación puede tomarse como especialmente digna de crédito (o, al menos, como que carece de los motivos generales de falta de confianza), y por tanto como que expresa la verdadera tendencia de la creencia del que habla en cuanto a los hechos que acaban de ser observados por él; y puede, por tanto, recibirse como testimonio de aquellos hechos. La situación ordinaria que presenta estas condiciones es

una riña o accidente ferroviario. Pero el principio mismo es uno amplio. 3 Wigmore, *On Evidence,* sección 1747, p. 738.

Las manifestaciones deben haber tenido lugar *antes de que haya habido tiempo para idear y tergiversar,* por ejemplo, mientras la excitación nerviosa se supone que todavía domina y las facultades reflejas están aún en suspenso. Esta limitación es en la práctica la materia de la mayoría de las resoluciones.

Debe observarse que las manifestaciones *no tienen que ser estrictamente contemporáneas* con la causa excitante; pueden ser subsiguientes a ella, siempre que no haya habido tiempo para que la influencia excitante pierda su influjo y sea disipada. La falacia, anteriormente tenida en cuenta por algunas cortes, de que la manifestación debe ser estrictamente contemporánea (*post,* sec. 1756) debe su origen a la aplicación errónea de la doctrina del Acto Verbal: * * *.

Además, no puede haber *ningún límite de tiempo definido y fijo.* Cada caso debe depender de sus propias circunstancias. * * *

Toda vez que la aplicación del principio depende, pues, enteramente de las circunstancias de cada caso, es por tanto imposible considerar las resoluciones sobre esta limitación como que tienen en rigor la fuerza de precedentes. El discutir de un caso a otro acerca de esta cuestión de "tiempo para idear o tergiversar" es jugar con el principio y llenar los autos de sutilezas innecesarias e infructuosas. Hay una pérdida lamentable de tiempo por parta de las cortes supremas en tratar aquí bien de establecer o respetar precedentes. En vez de esforzarse débilmente por lo imposible deben decisivamente insistir en que todo caso sea tratado por sus propias circunstancias. Debieran, si pueden hacerlo, levantarse perceptiblemente aun a la mayor altura de dejar la aplicación del principio absolutamente a la determinación de la corte sentenciadora. Hasta que sea alcansupremas sobre los detalles de cada caso continuarán multiplicando la lectura tediosa de la profesión. *Id.,* sec. 1750, págs. 744–751.' " (34 D.P.R. pág. 392 a 393.)

Dijimos además, en el caso de *Calventy,* supra, "que y hasta tanto un apelante pueda demostrar una abierta desatención o clara desviación del principio envuelto, no estaremos dispuestos a intervenir con el ejercicio de la sana discreción del juez sentenciador." (Pág. 393.)

■ En una serie de decisiones hemos sostenido que el tiempo transcurrido entre la ocurrencia de los hechos y las manifestaciones que se consideran parte del *res gestae*, no es el factor decisivo para determinar la aplicación de la doctrina. En *Pueblo* v. *Arenas*, 39 D.P.R. 16 (1929), las manifestaciones de la mujer ofendida hechas a su madre cuando la ve por primera vez cuatro días después de haberla tenido el acusado en casa de otra persona, se consideraron como parte del *res gestae* y se dijo: "No es cuestión de tiempo; esas frases son la exclamación primera, espontánea, y quizás irrefrenable, sin previa meditación, sin lugar a otro propósito deliberado que exponer a la madre su desgracia, como si ella hubiera acaecido cinco minutos antes."

■ En *Pueblo* v. *Blanco*, 40 D.P.R. 130 (1929), el tiempo transcurrido hasta que se hicieron las manifestaciones consideradas como parte del *res gestae*, fue de un año, pero durante todo ese tiempo la ofendida estuvo bajo el dominio físico del acusado guardando silencio bajo amenaza de violencia física e incomunicada de sus familiares. Cuando por primera vez ve a su hermana le relata lo que le ocurrió con el acusado. En muchas otras decisiones, entre ellas, las de *Pueblo* v. *Fuentes*, 63 D.P.R. 44 (1944); *Pueblo* v. *Muñoz*, 68 D.P.R. 171 (1948); *Pueblo* v. *López*, 76 D.P.R. 378 (1954); y *Pueblo* v. *Vázquez*, 77 D.P.R. 933 (1955), las manifestaciones de la ofendida admitidas en evidencia como parte del *res gestae*, no fueron contemporáneas con los hechos que las motivaron pero se aplicó la doctrina a base del carácter espontáneo de las manifestaciones, tomando en consideración las circunstancias que impedían a la ofendida hacer una queja contemporánea con la realización por el acusado de los hechos delictivos. Como dijo el Profesor Wigmore, la manifestación que entonces tiene lugar debe responder de una manera espontánea y sincera a las sensaciones y percepciones reales ya producidas por la sacudida externa. Quizás reco-

giendo el pensamiento del Profesor Wigmore, y de la doctrina jurisprudencial en este campo, algún tratadista ha comentado que en el *res gestae*, son los hechos los que hablan a través de las partes, y no las partes las que hablan sobre los hechos. Como para la aplicación de la doctrina deberá el juzgador atenerse a las circunstancias particulares da cada caso, nos parece que en el que ahora consideramos ha habido una desviación del principio envuelto. Del conjunto de la prueba que ya hemos reseñado se hace un tanto difícil, por ser improbable, creer que la mujer ofendida estuvo inhibida, bajo el temor de las amenazas del acusado, de haber dado la queja a su abuela u otra persona en fecha contemporánea con los hechos, siendo por tanto improbable que la queja admitida en evidencia fuera espontánea y en su consecuencia admisible en evidencia. Los hechos relatados por la propia ofendida, dan margen a dudar de si en realidad el acusado tuvo relaciones sexuales con ella por medio de la fuerza y la violencia y bajo amenazas de sufrir daño corporal. Nótese que la ofendida declara haber fundado su temor en que el acusado tenía en su hogar un revólver. En ninguna de las ocasiones en que ella tuvo relaciones sexuales con el acusado éste hizo uso de ese revólver para amenazarla. El sitio donde sostuvieron esas relaciones, el tiempo que el acusado pasaba con la ofendida en la cama de ésta, las condiciones en que realizaba los actos sexuales, amén de la impresión que deja la prueba sobre las promesas que le hizo el acusado, de darle dinero y enseñarla a guiar vehículos de motor y el temor de la ofendida de que su tía embarazada se enterara de las relaciones sexuales que sostenía con su esposo, son algunas de las circunstancias que hacen sospechosa la credibilidad del testimonio de la ofendida en cuanto a los elementos de fuerza, violencia y amenazas que se requieren para la comisión del delito de violación. Éstas son circunstancias que debemos considerar para determinar si realmente la queja de la ofendida a su abuela es parte del *res gestae*.

Su silencio al día siguiente de su primera experiencia sexual con el acusado, cuando viaja en un automóvil en compañía de Segundo y su esposa María desde la Extensión San Agustín en Río Piedras hasta la casa de su abuela en el Barrio Carraízo de Trujillo Alto, lejos ya del alcance del acusado; el transcurso de toda una semana en casa de su abuela, libre de la presencia del acusado quien durante toda esa semana no fue al Barrio Carraízo; su aceptación a regresar después de esa semana a la casa del acusado para quedarse en ella con el propósito de ayudar a su hermana, sin la menor protesta; su disposición a quedarse horas y horas en la cama con el acusado, ambos desnudos, para realizar varios actos carnales con el correspondiente descanso entre uno y otro acto, despojan en verdad de espontaneidad la queja que la ofendida da a su abuela varios días después de ocurrir los hechos.

Por otro lado, la prueba nos da la impresión de que la ofendida guardó silencio en parte, no por temor a las amenazas del acusado sino porque su tía estaba en estado de embarazo, o sea, por consideraciones distintas, calculadas para no hacer un supuesto daño a su tía. Deben pesar también en el ánimo del juzgador, como dijimos antes, las circunstancias relacionadas con las promesas que le hizo el acusado a la ofendida y su probable incumplimiento como factor que la decidieron a quejarse a su abuela de lo que le había sucedido.

Siendo inadmisible el testimonio de la abuela de la mujer agraviada sobre la queja, por no ser parte del *res gestae*, no hay otra prueba de corroboración en el récord, y por tanto el veredicto condenatorio no puede prevalecer.

*Se revocará la sentencia apelada y se dictará otra absolviendo al acusado.*

El Juez Presidente Señor Negrón Fernández no intervino.