Salas Soler, Juez Ponente
*962 TEXTO COMPLETO DE LA SENTENCIA
En causa criminal (sodomía y actos lascivos e impúdicos) se cuestiona suficiencia de prueba para convicción más allá de duda razonable e idoneidad del jurado, por no estar compuesto de vecinos del lugar de residencia del acusado (Vieques).
HECHOS
El apelante señor Angel M. Sánchez González (Sánchez) recurre pro se el día 3 de septiembre de 1998, sobre sentencia dictada el 7 de agosto de 1998 por el Tribunal de Primera Instancia, Sala Superior de Fajardo, Honorable Juez Daniel López Soto. El señor Sánchez recurre en apelación alegando en síntesis que el jurado no estuvo constituido conforme a derecho y que la prueba no fue suficiente como para establecer su culpabilidad más allá de toda duda razonable.
El 9 de septiembre de 1998, la Leda. Margarita Carrillo Iturrino asumió la representación legal de Sánchez y solicitó la regrabación de los procedimientos ante instancia, lo que fuera declarado con lugar. Las partes presentaron el 22 de septiembre de 1999, una adecuada exposición narrativa estipulada de la prueba (E.N.P.). El apelante presentó su alegato el 22 de octubre de 1999, y el Procurador General el correspondiente el 22 de noviembre del mismo año. Habiendo considerado a cabalidad la E.N.P. , los autos y los articulados alegatos de las partes, estamos en condiciones de resolver, lo cual hacemos confirmando la sentencia. Exponemos.
El señor Sánchez resultó convicto de violar el Art. 103 del Código Penal (Sodomía, 32 L.P.R.A. 4065) en varias ocasiones y de violar el Art. 105, supra, en su modalidad de tentativa de actos lascivos e impúdicos, 32 L.P.R.A. 4067. Por las violaciones al Art. 103 del Código Penal, el tribunal le impuso penas de doce (12) y diez (10) años de cárcel, a ser cumplidas de forma concurrente entre sí. En el cargo por actos lascivos e impúdicos, el tribunal le impuso una pena de ocho (8) años de cárcel a ser cumplida consecutivamente con las anteriores, para un total de veinte (20) años de cárcel. 
La prueba de cargo consistió en los testimonios de la menor perjudicada, Nydia Sánchez Ortiz (Nydia) , quien relató como su padre biológico cometió actos lascivos y sodomía contra su persona, habiendo ocurrido los hechos durante el año 1993, en el hogar de la familia sito én el Barrio Destino de Vieques. Nydia nació el 21 de septiembre de 1981 en Fajardo y para la fecha de los hechos era una niña menor de catorce (14) años. También testificaron Luz Celenia Rodríguez Laboy , trabajadora social en el Departamento de la Familia, oficina local de Vieques desde hacia diez años y Gladys Rivera , trabajadora social escolar con trece (13) años de experiencia. Trabajaba en la escuela intermedia en donde estudiaba Nydia hacía tres (3) años. Conocía a Nydia porque ésta cursaba en dicha escuela el noveno grado. A ambos testigos la menor perjudicada le relató lo ocurrido con su padre. La defensa utilizó el testimonio del apelante Sánchez , quien negó los hechos; Daniel Rivera Camacho , novio de la perjudicada; Carmen Socorro Ortiz , madre de la perjudicada y esposa del apelante, y los testigos de reputación Diane Rivas Serrano, Jennifer Marie Marrero y Elba Nydia Maldonado .
*963 En su Escrito de Apelación presentado el 3 de septiembre de 1998, Sánchez hace cinco (5) señalamientos de error que pueden resumirse como sigue: (1) vulneración de su derecho constitucional a ser juzgado por un jurado representativo de la comunidad como consecuencia de que en el panel seleccionado no había jurados de la isla de Vieques en donde residía el apelante; (2) al denegársele la recusación general del jurado; (3) al no cumplir el Ministerio Público con su deber constitucional de establecer la culpabilidad del apelante más allá de toda duda razonable, ni rebatir la presunción de inocencia de Sánchez; (4) al encontrársele culpable a base de una prueba de cargo insuficiente en derecho y contradictoria, y (5) al admitirse en evidencia prueba inadmisible.
En su alegato, el apelante discute sólo tres (3) de los errores por el antes señalado. Estos son: (1) que el Ministerio Público no cumplió con su deber constitucional de establecer la culpabilidad del apelante más allá de toda duda razonable, ni rebatir la presunción de inocencia; (2) que el apelante fue encontrado culpable a base de prueba de cargo insuficiente en derecho y contradictoria, y (3) que durante el proceso se excluyó en evidencia prueba admisible en derecho.
Es norma reiterada que la sola alegación de un error en un recurso apelativo, que luego no es fundamentado ni discutido por el apelante o recurrente, no es suficiente para revocar la decisión cuya revisión se solicita. Quiñones López v. Manzano Pozas, Opinión del 25 de junio de 1996, 96 J.T.S. 95. Por consiguiente, la parte apelante no ha puesto a este foro apelativo intermedio en condiciones de revisar los señalamientos de error no discutidos. No obstante, deseamos consignar que los señalamientos sobre la falta de legalidad del jurado constituido no tiene méritos y por lo tanto, era improcedente la recusación general del mismo. La Regla 96 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, establece quiénes son elegibles para ser jurados en Puerto Rico. En ningún lugar de la misma se establece que es necesario residir en el municipio donde reside el acusado para poder ejercer como jurado en su juicio. Sólo se requiere haber residido un año en Puerto Rico y noventa días en el distrito ante de elegírsele e inscribir su nombre en la lista de jurados.
EXPOSICION Y ANALISIS
El triste y lamentable cuadro fáctico creído y dilucidado por un jurado en juicio que se celebró el 22 de julio de 1998 puede resumirse así. La familia en cuestión está compuesta de Sánchez, su esposa Carmen Socorro Ortiz, la perjudicada Nydia y su hermano mayor Marcos, quien tenía 18 años a la fecha del juicio. La familia residía en una residencia de dimensiones reducidas en el Barrio Destino de Vieques. Nydia era estudiante en 1993 en la Escuela 6 de septiembre de 1988.
Para un entendimiento cabal de los hechos que dieron margen a las acusaciones contra Sánchez, transcribimos in extenso el testimonio de su hija Nydia.
Durante el año 1993, una noche estaba en su cuarto, su hermano estaba en el cuarto de él y su madre estaba en la sala de la casa viendo televisión. A la testigo le dio hambre y se lo dijo a su mamá que estaba sola en la sala viendo televisión y la mamá le dijo que buscara en la cocina y se preparara un “sandwich” y fue a la cocina a prepararse un “sandwich”. Mientras ella caminaba para la cocina, su madre iba para el baño.
Explicó que en la casa primero está el balcón, luego la cocina, al lado hay una pared que divide la cocina de la sala. Después hay un pasillo y lo primero que está es el baño. Frente al baño está el cuarto de sus padres y luego el de ella.
En la cocina, buscó el pan, el jamón y el queso. Se dirigió al fregadero en donde empezó a preparar el “sandwich”. En ese momento, en la sala no había nadie, ya que su madre se había ido para el baño. Cuando *964 ella estaba preparándose el “sandwich”, su padre entró a la cocina. La arrinconó contra la pared, entre la estufa y una mesa que tenía un televisor. Dijo que tenía puesta una bata larga, “panty” y “brassiere”. Estaba descalza. Su padre le alzó la bata, le bajó el “panty”, le tocó la vagina, le pasó la lengua por la vagina y la olió. Mientras el padre hacía esto, Marcos llegó a la cocina a la entrada y vio lo que estaba sucediendo. Ella le hizo señas para que fuera a buscar a su mamá. Marcos se fue, entró a su cuarto, pero no buscó a su mamá.
Su padre terminó de hacer lo que estaba haciendo, se levantó y se fue. Lo hizo una vez. Esto pasó rápido. Su padre se levantó, pues estaba agachado, tenía puesto un pantalón corto en ese momento. Ella estaba parada de frente hacia la entrada de la cocina. El padre estaba de frente a ella y de espalda a la cocina.
Explicó que cuando esto sucedió, ella estaba parada de frente hacia la entrada de la cocina y él estaba de espaldas a la cocina.
Cuando su papá se levantó, terminó y se fue para el cuarto. Ella le tocó en la puerta del baño a su madre para que abriera y contarle lo que había pasado. En el mismo momento, su hermano salió del cuarto de él para decirle a su madre lo que había pasado. Ambos se lo dijeron a la madre, quien se lo dijo a la abuela de la testigo.
Declaró que le dijo a su madre que estaba preparando un “sandwich” en la cocina cuando su papá le levantó la bata, le bajó los “panties”, pasó la mano por la vagina, se la lamió y se la olió; que Marcos llegó y lo presenció; y que ella le hizo señas a Marcos para que la buscara. Cuando la testigo le hizo este relato a su madre, estaba ella y su hermano. Le cuenta lo anterior en el baño a la mamá. El padre estaba en el cuarto de él.
Su madre llamó por teléfono a la abuela y le contó lo que ella le había relatado. La abuela le dijo a su madre que estuviera pendiente de ella (de Nydia) todo el tiempo. Su madre estuvo protegiéndola todo el tiempo; siempre estaba con ella, y le puso una cadenita “aldaba” a la puerta de su cuarto debajo de la cerradura.
Después de este incidente, su padre la tuvo amenazada. Siempre le tuvo temor porque él es bien agresivo. Por cualquier cosa les decía estúpidos a ellos. Ella siempre le tuvo miedo desde pequeña; no le tenía confianza. No se atrevía a hablarle a él. Sus padres se pasaban peleando; discutían mucho. Una vez, su padre, en su presencia, cogió a su mamá por el cuello.
Después del incidente de la cocina, su madre confrontó a su padre.
Explicó que su padre trabajaba de tarde y llegaba por la madrugada. Un día su madre lo confrontó. La testigo no sabía que su madre lo había confrontado mientras ella dormía. Sus padres entraron al cuarto de la testigo; su padre la despertó a bofetadas. Empezó a decir que ella era una mentirosa, que porqué estaba diciendo esas cosas de él.
Ese día, ella tenía miedo. No fue a la escuela, sino que se quedó todo el día en el patio de la casa. Como a las 2:00 p.m., su padre la llamó para dentro de la casa. Le dijo que si seguía diciendo que él le había hecho eso, le iba a dar contra la pared. El estaba enojado; tenía coraje. Ella tenía miedo.
Una noche, cuando todos dormían, su padre entró al cuarto. La haló hacia el borde de la cama con las piernas hacia afuera; le subió la bata y le bajó los “panties”. Ella tenía “panties” y “brassiere". Tuvo relaciones anales con ella. Cuando esto pasó, ella estaba acostada con la cara en la almohada, boca abajo y las piernas hacia afuera de la cama. Su padre estaba en ropa interior, pantaloncillos blancos; no eran del tipo *965 pantaloneros.
Su padre estaba acostado encima de ella, y metió su pene en el ano de ella. El pene estaba duro. Ella sintió mucho dolor. Ella apretaba la almohada porque tenía miedo de que si gritaba, él la golpearía. Ella no podía moverse porque él pesaba mucho, él estaba encima, de ella y se movía para arriba y para bajo. Esto ocurrió rápido, no duró mucho tiempo. Ella se sintió mojada en las nalgas. Su papá se fue del cuarto y luego regresó con un pañito a su cuarto y la limpió. Le pasó el paño por esas áreas y la limpió. Luego él se fue del cuarto. Ella se acostó llorando. Este incidente ocurrió como cuatro veces, que ella recuerde.
Para marzo de 1995, su padre volvió a meterse en el cuarto de ella cuando ella dormía. La haló hacia el borde de la cama, le bajo los “panties” y tuvo relación anal con ella.
Estos incidentes ocurrieron tarde en la noche cuando su madre y su hermano estaban durmiendo.
Con quien primero la testigo habló de estos incidentes fue con su mamá; pero está no le creyó. Luego se lo dijo a su novio, después a una maestra, después a la directora de la escuela, a una trabajadora social y por último a una Agente de Delitos Sexuales.
Se tuvo que ir de Vieques el día de su graduación de noveno grado. Se fue para Guayama; antes de ir a Guayama estuvo con su mamá en un albergue en Cayey como una semana y media. Estuvieron en el alberque porque su madre presentó una querella por violencia doméstica porque su padre la maltrataba, le pegaba. Luego volvieron a Vieques a la casa de sus padres. Cuando ellas regresaron del albergue su padre no vivía en la casa con ellas; vivía en una casa más arriba en la misma calle. El no podía vivir con ellas porque un juez de Fajardo se lo prohibió. Pero él iba todos los días a la casa porque allí tenía un negocio de pintura de carros. Ella lo veía a él todos los días, pero su padre no le hablaba a ella, sino que hablaba con la madre de la testigo. No los vio peleando.
Cuando regresó a Vieques, la entrevistó una trabajadora social de Servicios Sociales y otra de la escuela. Le preguntaban si todo estaba normal. Vivían, Marcos, su madre y ella. Luego fue a vivir con su tía a Guayama por un acuerdo que llegó la madre con el tío y el Departamento de Servicios Sociales.
Cuando regresaron a Vieques, al principio su madre no le hablaba a la testigo; luego le insistía que retirara los cargos, que lo perdonara, que él se había metido a la iglesia, que él había cambiado. La testigo le respondió a su madre que no era posible que él cambiara de un día para otro. Todo el tiempo recibía presiones de su mamá.
La testigo le dijo a la trabajadora social de la escuela que su madre la presionaba. Cuando recibía esta presión se sentía confundida. En un momento, le dijo a su madre que iba a retirar los cargos por la presión, pero era verdad lo que decía.
Antes de 1993, además de vivir con sus padres en el Barrio Destino de Vieques, se quedó por corto tiempo en casa de su abuelo en Guayama, se quedaba semanas allá. No recuerda por cuanto tiempo. Se quedaba allí por ser los padres de su mamá. Tenía doce (12) años. Venía con su mamá y su hermano. No le pedía permiso a su papá, entiendo no tenía que pedirle permiso, pues iba con su mamá y su hermano. En las mañanas la llevaba su mamá a la escuela, en la tarde la buscaba su mamá o se iba a pie. El papá nunca lá llevaba. Declara que no le pedía a su papa que la llevara a la escuela antes de 1993 porque no le tenía confianza y le tenía miedo. Para que haya confianza entre padre e hijo tiene que haberla y no la había.
*966 Dijo que su padre la tenía amenazada después del incidente de la cocina. Prestó declaración jurada en Fiscalía el 11 de junio de 1996. Juró que iba a decir la verdad. En dicha declaración, marcada como identificación 1 de la defensa, se le preguntó; “Tupapá, ¿en algún momento te amenazó con hacerte algo?” A esta pregunta, ella respondió que no. Se le preguntó por qué había dicho en la declaración jurada que no la tenía amenazada; respondió que la amenaza fue después de la última ocasión. Se le indicó que la declaración jurada la prestó depués de la última ocasión y se le preguntó porqué había dicho en la declaración que su padre no la había amenazado; respondió que el abogado le preguntó si había sido amenazada después del incidente de la cocina. Dijo no recordar el grado en que estaba en 1993; se encontraba confundida, se acuerda de algunas cosas.
Al momento del juicio vivía en Guayama con su esposo. No se había casado. No se ha casado, ni tiene certificado de matrimonio. Vive con su esposo desde junio de 1997, cuando tenía 16 años. Declaró que nació el 21 de julio de 1983. No le pidió permiso a su madre para irse a vivir con su esposo. Se lo dijo a su abuela para que ésta se lo dijera a su madre. No se lo dijo a su madre porque no tenía comunicación con ella. No le pidió permiso a su padre. No se lo dijo a su hermano Marcos.
Declaró que sus relaciones con su hermano, luego del incidente de la cocina, estuvieron bien.
Su delación con su mamá, luego del incidente de la cocina, fue igual, nunca hubo , comunicación. Antes del incidente tampoco había buena comunicación con su padre. No había comunicación de padres e hijos.
Añadió que sus padres peleaban de palabra y físicamente. Declaró no recordar la fecha en que su padre empujó a su madre. Dice fue entre la sala y el pasillo. Declaró no habérselo dicho a su hermano, ni fue a la Policía.
Declaró que después de esa noche su madre la protegía, estaba con ella todo el tiempo, le puso una cadenita a la puerta del cuarto. No recuerda cuánto tiempo pasó desde ese tiempo hasta que el papá la sodomiza.
Declaró que el padre la sodomizó cuatro veces desde 1993 hasta 1995. Estaba en octavo grado cuando pasó la última sodomización. No se lo dijo a la Policía porque tenía miedo. No le dijo a su hermano Marcos. Se lo dijo a su madre cuando pasó la segunda sodomización; no se lo dijo la tercera, porque la segunda vez no le creyó, la cuarta tampoco se lo dijo.
Declaró que su mamá es buena, pero no había confianza entre ellas, que siempre fue así desde pequeña. Con su papá no tenía ninguna comunicación. Dice no se comunicaba con nadie, no había esa confianza de padres e hijos.
El padre se molestó con ella cuando supo que ella tenía novio, porque la quería para él, porque no quería que ella tuviese novio.
*967 Cuando regresaron de Cayey, el papá no vivía en la casa, pero él iba todos los días porque tenía un negocio en la casa. Declaró haber visto a sus padres hablando.
Nunca volvieron a vivir con su papá en Vieques. Se fue a vivir con su tío por un acuerdo entre él y su mamá y el Departamento de Servicios Sociales en Guayama.
Declaró, que ha recibido presiones de su mamá para que retire los cargos, que su padre estaba en la iglesia. En su momento dado le dijo a su mamá que retiraría los cargos. Estaba confundida. Declaró que su papá le dijo que le iba a partir la cara.
Daniel iba a la casa de la testigo porque era amigo de Marcos y se pasaban jugando Supemintendo. Su madre sabía que eran novios; cuando su padre lo supo, se molestó. Daniel iba a la casa, pero no a verse con ella.
El apelante señor Sánchez testificó que es pescador y además trabajó como guardia de seguridad en la base militar de Vieques hacía quince (15) años. Negó totalmente los hechos y no supo porqué Nydia lo había denunciado por actos lascivos y sodomía. Expresó que la relación con su hija era mala porque ella no obedecía. Se opuso al noviazgo de su hija con Daniel, por ser ella una menor y su novio Daniel un drogadicto. Para la fecha de los hechos, Sánchez pesaba de 250 a 280 libras y medía de estatura 5' 9 1/2”. Desde el año 1991, su esposa dormía en el cuarto de la hija. En su resumen, su testimonio estipulado fue uno parco. En abono a su buena reputación comparecieron como testigos Dianne Rivas Serrano, guardia de seguridad de la base; Jennifer Marie Marrero Calderón quien describió a Sánchez como hombre trabajador, cristiano, respetuoso y buen padre y Elba Nydia Maldonado quien describió la reputación de Sánchez como excelente y quien por algunos años le compró el marisco que pescaba. La esposa de Sánchez, señora Carmen Socorro Ortiz, quien defendió a su esposo, aun cuando fue objeto de violencia doméstica, y puso una “cadenita” en la puerta del cuarto de su hija Nydia y durmió en varias ocasiones en el cuarto de su hija. El testimonio de Daniel Rivera, novio de Nydia, testificó que supo que Nydia había sido abusada por su padre.
En hábil argumentación, la parte apelante nos presenta en su Alegato que la “presunta víctima” albergaba motivaciones para haberle imputado a su padre las imputaciones de los cargos que hiciera. Una de ellas, la prohibición que le hiciera de asistir a su graduación de noveno grado, y la otra de dedicir convivir consensualente con su novio. Las motivaciones, si algunas o válidas, fueron dilucidadas por el jurado que las aquilató, meditó y decidió. No encontramos nada en los autos y la E.N.P. que intranquilize nuestro espíritu.
Los señalamientos de errores de que no se rebatió la presunción de inocencia; de que la prueba de cargo fue insuficiente en derecho y contradictoria; y que se excluyó en evidencia prueba admisible en derecho no fueron cometidos. Nydia narró lo sucedido a dos trabajadoras sociales, señoras Rodríguez Laboy y Gladys Rivera. Estas corrobararon el testimonio de la menor. Los testimonios de Sánchez y de la madre de la menor no le merecieron credibilidad al jurado. Los jueces no vivimos en una burbuja aislada de la comunidad donde residimos. Sabemos que el abuso de menores es constante y consistente. Este caso trata de una menor que hace lo indecible, dentro de sus pocos y pobres medios, para defenderse de un padre maltratante y abusador. Lo hace con la ayuda a medias de una madre que opta por inclinar su balance hacia su compañero, y en contra de su hija. Se convierte así en una madre encubridora, en lugar de protectora con su prole. Sobre el señalamiento de que se excluyó en evidencia prueba admisible en derecho, coincidimos plenamente con lo que expresa el Honorable Procurador en el sentido que la exclusión del testimonio de Daniel Rivera Camacho, novio de Nydia, respecto a que alegadamente había sostenido relaciones sexuales con ella, y el cual se llevó a cabo bajo el procedimiento que dispone la Regla 9 de las de Evidencia, 32 L.P.R.A. Ap. IV, en nada hubiera variado el resultado del caso.
*968 Acogemos y citamos con aprobación lo expresado por el Honorable Procurador en su Alegato a la página 8, por ser atinada su cita dentro de las circunstancias particuales de este caso.
“Debe tenerse presente que basta la evidencia directa de un testigo que le merezca entero crédito al juzgador de hechos para probar cualquier hecho, salvo que por ley se disponga otra cosa. Regla 10 (D) de Evidencia, 32 L.P.R.A. Ap. IV; Pueblo v. Acevedo Quiñones, 100 D.P.R. 894, 899 (1972). Además, en casos como el de autos en que se trata de delitos de naturaleza sexual cometidos contra una menor por su padre, es comprensible la renuencia de la menor a relatar lo sucedido por el trauma sufrido y la vergüenza adicional que genera el proceso judicial. De ahí que el Tribunal Supremo de Puerto Rico ha elaborado criterios para evaluar la credibilidad de la víctima menor de edad en casos de violación, aplicables a otros delitos contra menores, a nuestro entender, teniendo en cuenta su edad, personalidad, educación, núcleo familiar, condición física y mental, madurez, entre otros factores. Sobre el particular, en Pueblo v. Rivera Robles, 121 D.P.R. 858, 862-865, el Tribunal expresó:

“Reconocer estos efectos perjudiciales psicológicos a corto y a largo plazo, y saber que juzgamos la conducta patológica, una dinámica compleja singular, producto de las interacciones sexuales entre adultos y menores, explica porqué la credibilidad de la víctima ha de evaluarse tomando en cuenta su edad, personalidad, si es tímida e indecisa o resuelta y determinada; educación y escolaridad; tipo de núcleo y grado de estabilidad familiar; condición física y mental, grado de madurez; etc. Todos estos elementos influirán en cómo reaccionará al momento de ser atacada y con posterioridad. En muchas instancias, su silencio posterior por días, meses y hasta años no debe sorprendemos. “El abuso sexual raras veces es un hecho aislado en la vida de una (un) menor. Con frecuencia, cuando el abuso se descubre ha estado ocurriendo por un período que va desde meses hasta 4, 6 y más años. ” Semillas para el Cambio, Boletín del Centro de Ayuda a Víctimas de Violación, Departamento de Salud, junio de 1985, núm. 2, pág. 2, “Casi todos los estudios estadísticos reflejan que los niños son más vulnerables al abuso sexual entre las edades de 8 a 12 años, al comienzo de la preadolescencia. ” (Traducción nuestra). D. Finkelhor, Sourcebook on Child Sexual Abuse, California, Ed. Sage Publications, 1986, pág. 64.

La naturaleza del delito cometido, el estigma personal y social que conlleva, la ambivalencia ante el agresor adulto, en particular si éste es la figura dominante de autoridad de uno de sus progenitores o familiar, explica la renuencia a relatar lo sucedido. Mientras no hablan, nadie se entera. Después de todo, los seres humanos tenemos la natural tendencia a olvidar lo penoso, desagradable y traumático. Aún así, todo tiene sus límites. La repetición de unas experiencias dolorosos y conflictivas, o la posibilidad de que sea un patrón de conducta recurrente, pueden resultar estímulos más fuertes que la inhibición y llevar a la víctima a romper su silencio y relatar lo sucedido, aun a riesgo de la afrenta y vergüenza. Tal actuación es perfectamente comprensible. ”

Por ello, el Tribunal Supremo de Puerto Rico ha sostenido la conveniencia de recurrir a testimonio pericial con el propósito de que el foro judicial pueda emitir juicio sobre la culpabilidad o inocencia del acusado, basado dicho testimonio en la teoría del “síndrome del niño abusado sexualmente” Pueblo v. Canino Ortiz, Op. de 7 de diciembre de 1993, 93 J.T.S. 157, pág. 1316, 134 D.P.R. _ (1993). Conforme a dicha teoría, un niño que es víctima de abuso sexual, de ordinario, exhibe unas características propias de esa situación, tales como miedo, vergüenza, retraimiento y bajo aprovechamiento escolar. Sin embargo, aunque dicho testimonio pericial puede corroborar el testimonio del menor, ello no tiene el propósito de abdicar a favor del perito la función de adjudicar credibilidad, la cual es exclusiva del juzgador de los hechos. Pueblo v. Montes, 188 D.P.R. 164 (1986). Recordemos que el Tribunal no está obligado por la prueba pericial, e inclusive puede descartar la misma y llegar a sus propias conclusiones. La falta de pmeba pericial psicológica en el caso de autos no restó credibilidad alguna al testimonio vertido en sala por la menor. Dicho testimonio fue evaluado por el *969 jurado, quien la vio y oyó declarar. Pueblo v. Cabán Torres, supra, a la pág. 634; Pueblo v. Cruz Pabón, supra, a la pág. 947.
En el caso de autos, el apelante sostiene que debido a que la menor perjudicada no exhibió tristeza ni retraimiento, es decir las características que de ordinario exhibe un niño objeto de abuso sexual hasta el año 1996, fecha en que relató los hechos delictivos, ello es indicativo de que no fue objeto de actos lascivos y sodomía por parte de su padre. Dicha premisa equivocada, parte de la creencia errónea de que existe un comportamiento esteriotipado que conlleva reacciones iguales y relatos uniformes por parte de las víctimas. Pueblo v. Rivera Robles, supra, a la pág. 869. También el apelante hace abstracción del testimonio pormenorizado y contundente de la víctima sobre la experiencia traumática sufrida, la falta de apoyo por parte de su madre frente al agresor y el temor que sentía ante la figura de autoridad que presenta para ella su padre.
Este recurso ha sido plenamente considerado y discutido; de hecho, hemos atendido a cabalidad, el resumen de la prueba que el señor Sánchez nos presenta en su alegato, páginas 2 a la 13. También lo hemos contrastado con la E.N.P. y aún a la mejor luz de la versión del apelante, el veredicto del jurado no nos produce insatisfacción o intranquilidad de conciencia que estremezca nuestro sentido básico de justicia. No estamos en disposición de intervenir con la adjudicación de crebilidad que realizó un jurado a nivel de instancia. En este caso, no intervendremos con el dictamen apelado, ya que están ausentes los elementos de pasión, prejuicio, parcialidad o error craso y manifiesto. Pueblo v. Cabán Torres, 117 D.P.R. 645 (1986). En este país no debe existir espacio para el abuso de menores.
DICTAMEN
Por lo antes expuesto, se confirma la sentencia apelada.
Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2000 DTA 55
1. La alegada falta de idoneidad del jurado consiste en que el acusado resultó convicto por un jurado que no estuvo compuesto de vecinos del lugar de su residencia, Vieques.
2. La Exposición Narrativa Estipulada de la Prueba consta de 23 páginas y refleja un esmero profesional de ambas partes en su preparación.
3. El veredicto de culpabilidad fue emitido por un jurado luego de celebrado el juicio el 22 de julio de 1998.
4. La Sentencia fue impuesta luego dé que Instancia considerara el informe pre-sentencia.
5. E.N.P. páginas 1 a 9.
6. Id., páginas 9 y 10.
7. Id., páginas 10 a 14.
8. Id., páginas 20 y 21.
*970 9. Id., páginas 14 y 15.
10. Id., páginas 16 a 19.
11. Id., páginas 21 a 23.
12. Id., páginas 2 a 6.
13. Alegato del apelante, página 17.
14. Id., página 18.
15. Alegato del Procurador, página 11.